[Nos. D015481, D015808. Fourth Dist., Div. One. June. 13, 1994.]

DOMINICK J. TOMASELLI et al., Plaintiffs and Respondents, v. TRANSAMERICA INSURANCE COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II. 3.-8. and II. 10.

**COUNSEL**

Higgs, Fletcher & Mack, Gregg F. Relyea, Horvitz & Levy, Barry R. Levy, Daniel J. Gonzalez and Christine T. Hoeffner for Defendant and Appellant.

Winters & Associates, Jack B. Winters, Jr., Thompson & McIntyre and Lann G. McIntyre for Plaintiffs and Respondents.

**OPINION**

**FROEHLICH, J.**—Dominick and Denise Tomaselli (Tomasellis) sued Transamerica Insurance Company (appellant), alleging appellant's refusal to pay a claim on their homeowners policy was both a breach of contract and in bad faith. The jury awarded contract damages of $260,000, emotional distress damages totaling $500,000, and punitive damages of $11,250,000. Appellant's claims fall into five basic categories: (1) that there is no substantial evidence to support the liability determinations; (2) that a series of evidentiary and instructional errors prejudiced the verdicts; (3) that the compensatory damages are excessive; (4) that the punitive damages award is unsupported by proper evidence and is excessive; and (5) that the attorney fee award is improper.

## I

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The Parties and the Policies*

Tomasellis purchased a three-year-old house in 1977. Between 1977 and 1982 they had homeowners insurance from Premier Insurance Company, an affiliate of appellant, and from 1982 through 1987 they purchased homeowners insurance from appellant.

The policies originally contained three relevant limitations on coverage: (1) an exclusion for earth movement; (2) a "prompt notice" requirement; and (3) a requirement that suit on any claim be filed within one year of the loss.

In 1984 appellant added a fourth relevant limitation—endorsement No. 14461 (hereafter the 14461 endorsement), which reduced coverage. Under the 14461 endorsement, losses caused by faulty or defective construction or compaction were excluded from coverage even if another covered cause had contributed to the loss. The 14461 endorsement was first listed by appellant as part of Tomasellis' policy beginning in July 1984.

#### B. *The Claim*

In May 1987, Tomasellis discovered a large crack in the house slab and submitted a claim for damages. Appellant promptly sent out an adjuster, Mr. Watanabe, who spent an hour at the property on May 19. He questioned Mrs. Tomaselli, went around the home looking for signs of damage, and took photographs. Mrs. Tomaselli pointed out various cracks, but made no mention of a bathroom crack at this meeting. Watanabe observed other signs of distress (primarily exterior stucco cracks, as well as a crack in the garage floor) which indicated there might be other problems.

On May 20, Watanabe prepared and sent an "Advance Large Loss Notice" to his superiors, Mr. Friend and Mr. Kirk. On May 27, he prepared a "claim brief" which summarized Tomasellis' claim. In his claim brief Watanabe indicated there were no "apparent" policy violations. At trial, Watanabe testified he had made no *final* determination of whether the policy provisions had been followed, which is why his brief reflected there were no "apparent" policy violations. Watanabe's brief noted Mrs. Tomaselli stated she did not know about the cracking in the house slab, did not understand the significance of the cracking in the garage slab, and the prior owner had not disclosed any soils problems to Tomasellis. The brief reported (1) a soils

engineer would undertake an investigation and (2) an "examination under oath" (hereafter EUO) might be conducted if warranted.

Also on May 27, Watanabe sent Tomasellis a "reservation of rights" letter. The letter specifically quoted the 14461 endorsement, the proof of loss clause and the "prompt notice" clause. Watanabe's letter made no reference to the "one-year-suit" clause, which requires that any suit be filed within one year of the loss. Watanabe testified he did not cite that clause in his May 27 letter because, at that point, he had no reason to believe Tomasellis had been on notice of the problems for an extended period of time.

## C. *The Investigation Begins*

The soils firm began its investigation in early June. By June 9, Watanabe began questioning whether Tomasellis had become aware of the damage at an earlier time, and hence Watanabe asked the engineer if he could determine when the damage first became manifest.

Also on June 9, Watanabe referred the matter to the Law Offices of Barry Zalma for analysis and advice as to coverage, and sent the firm the relevant documents. Watanabe indicated he was interested in "when" Tomasellis became aware of the damage and the issues surrounding the "concurrent cause" problems.[2] Watanabe's letter noted that Tomasellis admitted seeing the crack in the garage slab "within the last year" but Tomasellis had "dismissed the crack since it was not inside the dwelling." Watanabe's letter concluded by suggesting Tomasellis were "excellent candidate[s] for an EUO." Kirk, Watanabe's superior, testified an EUO was the only means of determining what the insureds knew and when they acquired the knowledge, the insureds being the only sources of information about progressive damage. Tomasellis' expert, on the other hand, testified the use of an EUO was improper and evidenced bad faith because: (1) use of an EUO is rare (absent some suggestion of fraud or lack of cooperation), and he had never heard of it being used in "concurrent cause" cases; (2) there was no reason to administer the EUO in this case; and (3) use of an EUO was a way appellant could "telegraph" to the coverage attorneys its intention to deny the claim.

## D. *Tomasellis' Prior Knowledge Surfaces*

The initial soils report, dated June 16, indicated that the problem was fill settlement which appeared to have been a long-term process occurring over

---

[2]The evidence indicated appellant used attorneys to assist in evaluating coverage questions, particularly in the area of concurrent cause losses, due to the complexity and uncertainty in the law as it existed at the time. The definitive case, which acknowledged and resolved this confusion (i.e., *Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395 [257 Cal.Rptr. 292, 770 P.2d 704]), was not decided until two years after Tomasellis' claim was under consideration by the Zalma law firm.

several years; that it was an ongoing process since "patched areas inside the house [were] beginning to crack again"; and that Tomasellis "stated that the stress features [had] gradually worsened and some [had] appeared more recently than others." Watanabe believed that the statement about damage worsening over time conflicted with Mrs. Tomaselli's earlier report that Tomasellis were unaware of any prior damage to the home, and noted this apparent discrepancy to the attorney.

The attorney from the Zalma law office assigned to handle the matter was Cynthia Hamilton. Hamilton told Watanabe on June 19 that she had insufficient information to evaluate and advise on the issue of when the cracking occurred and when the insured knew or should have known of damage, and that further information from the soils engineer and the insureds would help answer these questions. Her subsequent request for authorization to conduct an EUO was granted. Hamilton thereafter wrote to Tomasellis, indicating they should direct all further communications to her, and required them to produce 10 categories of documents for her inspection as part of the process of investigation. She also told them that an EUO was required. With respect to possible defenses, she indicated that in addition to the reservation of rights letter, the policy required "prompt notice" and "suit within one year" after inception of the loss, and that there was some question about when the loss occurred.

Before the EUO took place, Mrs. Tomaselli discussed the procedure with Watanabe. Watanabe told her it was not necessary to have her attorney present, and that the EUO was merely a procedure to help settle the claim. He did not reiterate the advice previously given by Hamilton, to the effect that a purpose of the EUO was to investigate potential policy violations.

During the EUO, conducted in mid-August, information about Tomasellis' knowledge of progressive damage began to surface. Tomasellis disclosed having had knowledge of the garage floor crack since 1980, which crack had been getting worse, and that they had noticed the patio separating and moving away from the house "a long, long time ago." However, they perceived all of their problems as insignificant.

They also disclosed, for the first time, the defects in the bathroom. They stated that in 1979 Mr. Tomaselli had removed the bathroom carpet and replaced it with tile, had noticed a crack at that time, but thought nothing of it. A few years later, cracks in the tile forced them to replace it, and at that time the tile setter told them cracking would be a recurring problem because of the crack in the slab beneath the tile.

At trial, Tomasellis testified Watanabe never told them the purpose of the EUO was to explore possible policy violations. Tomasellis' expert testified

insureds should be told they might want an attorney present, and Kirk agreed it would have been improper for Watanabe to dissuade Tomasellis from having an attorney present. Tomasellis felt intimidated and badgered during the EUO. They were never asked during the EUO about the alleged discrepancy between what they told Watanabe and what they said to the soils engineer. Mrs. Tomaselli testified she never told the soils engineer she had been long aware of the problems, and in fact first learned of them from the engineer.

At trial, Tomasellis testified they first noticed bathroom cracks in 1979 when Mr. Tomaselli replaced the carpeting in the bathroom. They testified that in 1983 they decided to change the tiling because of hairline cracks in some tiles, which they attributed to their son's dropping things on the floor, and also for aesthetic reasons. They hired Mr. Cerutti, a tile setter, to replace the tile. Cerutti testified he spotted a one-eighth-inch crack, pointed it out to the Tomasellis, and said he could not guarantee the work, warning that the crack could be very serious. Two weeks later, the crack indeed reappeared, and Cerutti came and fixed it. It later reappeared, but they then chose not to call Cerutti.

The final report of the soils engineer, dated September 15, 1987, concluded the cause of the problem was improperly compacted fill, but did not indicate when the problem would have been manifested.

E. *The Claim Is Denied*

Hamilton opined, based on the 14461 endorsement and the late notice of claim, that the claim should be denied. Appellant's file revealed that the 14461 endorsement became effective in mid-1984, and hence would apply. Hamilton also advised that late notice of the claim barred coverage. In her September 15 letter she specifically concluded that Tomasellis' EUO statements disclosed a number of items which cumulatively would likely alert a reasonable person to the existence of a problem, and that the bathroom problems alone (given the tile setter's advice of recurrence) were enough to have placed them on notice. Hamilton ultimately recommended denial of the claim. Kirk agreed that the late notice and one-year suit provisions applied, and approved denial of the claim.

As partial support of their claim of bad faith, Tomasellis produced evidence that Watanabe knew he was obliged to investigate fully, but they neither took further photographs nor tried to tear up the bathroom tiling to examine the crack. Watanabe conceded that if Tomasellis had been told it was a shrinkage crack they would not have been required to file a claim.

Kirk agreed a hairline crack under the bathroom tiles would not have been a sufficient basis for denying the claim. Watanabe never asked either Tomasellis or Cerutti, the tile setter, whether Cerutti had characterized the crack as a shrinkage crack, nor did appellant examine the crack to determine if it was a shrinkage crack.

F. *Appellant Again Denies the Claim After Tomasellis Request Reconsideration*

Tomasellis retained attorney Burrows after the claim was denied. Burrows wrote to Hamilton and stated that because denial was based on the concurrent cause endorsement, reconsideration was required because Burrows's review of Tomasellis' files indicated they had not received the 14461 endorsement or any notice thereof, rendering such endorsement inapplicable.

Hamilton told Watanabe of Tomasellis' request and suggested that although her review of the files indicated the 14461 endorsement was effective, it might be prudent to double-check whether Tomasellis had been sent the 14461 endorsement. Hamilton told Watanabe that in light of the "incredibly late notice" after the damages became apparent, rejection of the claim was still in order.

Hamilton also wrote to Burrows, informing Burrows (1) the demand for reconsideration had been forwarded; (2) Burrows's letter ignored the fact that denial was also based on late notice and a one-year suit; and (3) appellant was advised by its agent and records that Tomasellis were informed of all exclusions, and hence it appeared Burrows's belief that Tomasellis had not been notified of the 14461 endorsement was inaccurate, but that appellant should further review the matter. It appears that appellant never conducted any additional investigation into whether the endorsement had been sent.

Burrows responded by again demanding reconsideration. In this letter Burrows stated that Cerutti had told Tomasellis the bathroom crack was an insignificant "shrinkage crack." Watanabe did not believe that this "new" information warranted additional investigation, since it appeared to be inconsistent with the EUO testimony by Tomasellis that Cerutti had indicated the crack would cause recurring problems. Kirk testified he did not order any further investigation of the bathroom crack because, based on the soils report (indicating a long-term progressive deterioration of the damage) and the EUO admissions (i.e., the recurring tile problem, the moving patio, the cracks worsening over time), it was unlikely further investigation would have altered the coverage determination.

Hamilton reaffirmed denial of the claim on February 16. The lawsuit followed.

### G. *The Lawsuit and Judgment*

Suit was filed on April 29, 1988. Appellant filed a general denial. The trial engaged two principal issues: first, did Tomasellis file their lawsuit within one year of the loss, and second, assuming the lawsuit was timely, was the rejection of the claim in bad faith? The jury answered both questions in favor of Tomasellis, and awarded contract damages of $260,000 and emotional distress damages totaling $500,000. In the bifurcated punitive damages phase, the jury awarded $11,250,000. The trial court, sitting without a jury, awarded attorney fees. This appeal followed.

## II

### ANALYSIS

### 1. *There Is Substantial Evidence to Support the Breach of Contract Finding*

Appellant first challenges the judgment by arguing there is no substantial evidence to support the judgment for breach of contract, because the one-year-suit-clause requirement was not met. That clause is a valid limitation on an insured's right to sue on the policy and has the effect of precluding an insured from suing for relief more than one year after the loss becomes "manifest." (*Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 683 [274 Cal.Rptr. 387, 798 P.2d 1230], hereafter *Prudential-LMI*.) Appellant argues the loss here was manifested more than one year before suit was filed because the facts admittedly known to Tomasellis (i.e., the recurring bathroom crack, the substantial garage crack, the separating patio, etc.) demonstrated that they "knew or should have known" of the loss more than one year before they filed suit.

*Prudential-LMI* explained that the one-year period commences on "manifestation of the loss," which is that point when appreciable damage occurs and becomes or should become known to a reasonable insured. The court further explained that "[d]etermining when appreciable damage occurs such that a reasonable insured would be on notice of a potentially insured loss is a factual matter for the trier of fact." (*Prudential-LMI, supra,* 51 Cal.3d at p. 687.) We therefore must examine whether the evidence could support a jury's determination that Tomasellis did not know, and a reasonable insured would not know, of the loss.[3]

The finding that Tomasellis did not know is supported by their own testimony. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr.

---

[3]Appellant cites *Abari* v. *State Farm Fire & Casualty Co.* (1988) 205 Cal.App.3d 530 [252 Cal.Rptr. 565] to argue that when an insured discovers cracks, and the cracks grow over a

79, 536 P.2d 479] [testimony of single witness is substantial evidence].) Tomasellis testified they did not notice or fully understand the significance of the patio separation; they did not believe the garage cracking presented any problems, since it was "separate from the house"; and they were not told the bathroom crack was "serious." The other problems they experienced, such as stucco cracks, door problems, etc., could also be dismissed, they thought, as ordinary wear and tear.

The determination that a reasonable person would not have known of the loss, while presenting a closer question, also has evidentiary support. In addition to Tomasellis' testimony that they did not understand the significance of the signs until they were educated by the geologist, Watanabe admitted the geologist's report described the bathroom crack as "hairline," and Watanabe had learned (during a seminar presented by attorney Zalma) that "hairline cracks" are so commonplace they would not be a manifestation of cognizable damage of concern to a reasonable man. Watanabe also testified average homeowners occasionally do not understand the significance of such signs of distress.

We need not catalog all of the evidence supporting Tomasellis' position. It is sufficient to state there was evidence from which a jury could have concluded a reasonable insured would not have known of the loss more than one year before this lawsuit was filed.

### 2. *There Is Sufficient Evidence to Support the Bad Faith Finding*

■ Appellant next argues that even if the Tomasellis are to prevail on their contract claim, there is no substantial evidence to support the bad faith finding. It further argues that even if it erred in denying the claim, there were ample grounds for believing it should be denied, and hence denial was not unreasonable as a matter of law.

■ The law clearly states that erroneous denial of a claim does not alone support tort liability; instead, tort liability requires that the insurer be found to have withheld benefits unreasonably. (*Opsal* v. *United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352].) The mistaken

---

period of years, the insured's later suit is barred because the facts are sufficient as a matter of law to put him on notice. *Abari* does not compel reversal. First, *Prudential-LMI* established (post-*Abari*) that manifestation is a question of fact, not an issue of law. Second, and more importantly, Abari was a pleading case in which the insured alleged notice and deterioration over time, but *declined to allege that he was not alerted to the gravity* of the problem. On those allegations the *Abari* court concluded the damage was manifested. (*Id.* at p. 535.) Here, however, Tomasellis did produce evidence they believed the damage was insignificant and they were unaware the cracks were growing.

withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability. (*Ibid.*) The insurer must of course consider the interests of its insured, but it is also entitled to give its own interests consideration. (*Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1459 [7 Cal.Rptr.2d 513].)

■ The determination of bad faith in this case depends on an identification of inferences permissibly drawn from the facts. Appellant posits that its reliance on the one-year-suit clause was reasonable, given (1) the facts revealed in the EUO, (2) the evidence of other signs of long-standing distress, (3) the statement Mr. and Mrs. Tomaselli each allegedly made to the geologist that "the stress features have gradually worsened," (4) the statement of each in the "proof of loss" form that "[a]ll indications are that this problem has been ongoing since 1979-1980." We agree that an objective approach to the evidence would suggest appellant was merely negligent in denying coverage.

The inferences argued by Tomasellis, however, paint a more sinister view: a scenario of an insurer searching for ways to avoid paying the claim. Tomasellis claimed, and their expert testified, the investigation was inadequate. For example, even though Hamilton advised Watanabe that the bathroom problem might be the *only* basis on which to impute early notice, appellant neither examined the bathroom crack nor tried to find Cerutti to determine what he observed or what he told Tomasellis. In Tomasellis' view, the mere conducting of an EUO evidenced bad faith: EUO's are ordinarily administered to investigate fraudulent claims, and Watanabe ordinarily did not use EUO's early in an investigation. However, use of the EUO was early here, and was recommended just two weeks after Watanabe had commented that he believed Tomasellis were "not previously aware of any soils-related distress." Moreover, Watanabe misled Tomasellis about the EUO, since (1) he assured them it was a simple procedure to help settle the claim, (2) he dissuaded them from having an attorney present, and (3) he failed to inform them that the purpose of the EUO was to search for information of policy violations.

Tomasellis in addition identified other indicia of bad faith. For example, Tomasellis pointed to evidence showing appellant relied on the 14461 endorsement, even though Tomasellis told appellant it had not been sent to them. Even assuming appellant might have been justified in believing that the endorsement had been received by Tomasellis, the jury could have found that appellant's reliance on the endorsement to deny the policy benefits was erroneous. Appellant had not enforced the endorsement as to existing policyholders, such as Tomasellis, because appellant was of the view the notification of the endorsement may not have adequately alerted policyholders to

the change in coverage (following authority such as *Fields* v. *Blue Shield of California* (1985) 163 Cal.App.3d 570 [209 Cal.Rptr. 781], stating that failure to use clear, conspicuous and plain language in a notification of reduction in policy coverage renders the reduction ineffective). Further, Hamilton's letter responding to Tomasellis' assertion that they had never received the endorsement implicitly asserted Hamilton had rechecked with the agent and confirmed the endorsement had been sent to Tomasellis, when in fact she had not rechecked with Watanabe. No follow-up effort was made to determine whether Tomasellis had received the endorsement, yet appellant continued to rely on it.

Of course appellant denies its investigation or claims handling were in bad faith, and posits innocent explanations for each of the indicia of bad faith cited by Tomasellis. While these charges and counter-charges demonstrate that the evidence can be viewed differently, they also demonstrate that the issue was one for the jury to decide, and that either determination would find adequate evidentiary support. (*Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 710 [201 Cal.Rptr. 528].) Accordingly, a jury could find that both the handling and ultimate denial of this claim were unreasonable and in bad faith.

3.-8.*

. . . . . . . . . . . . . . . . . . . . . . .

9. *The Punitive Damage Award Must Be Reversed*

The punitive damage award is defective on two unrelated grounds. While reversal theoretically could be founded on only one of these grounds, we deem it appropriate in this case to review both.

A. *Failure to Establish Financial Condition*

▮▮▮ The first ground of reversal is the failure by plaintiff to carry the burden of proof of establishing the defendant's financial condition, as required by *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 119 [284 Cal.Rptr. 318, 813 P.2d 1348]. Our review of that recent authority convinces that this is a requirement imposed as a matter of public policy and hence not subject to waiver by the failure of an inattentive defendant to object or otherwise call attention to the inadequacy of plaintiff's proof.

The only evidence of "financial condition" introduced by the plaintiff was the 1990 Annual Report of "Transamerica Corporation." We assume that this

*See footnote, *ante*, page 1269.

entity is the parent corporation for appellant. It is apparent, however, that this annual report is a consolidated financial statement for the parent company and all of its many subsidiaries. However, the annual report contains no *separate* information on appellant's financial status. Instead, the annual report was for the parent company and encompassed the assets, revenues and profits from a host of businesses (such as consumer lending, commercial lending, leasing, real estate services, investment management, life insurance, etc.) which are wholly unrelated to appellant's business. The only part of the annual report even remotely germane was a section summarizing the financial status of something described as "Transamerica Insurance Group." We surmise appellant's financial condition is encompassed within those consolidated numbers. However, the issuer of the policy and appellant here is Transamerica Insurance Company, *not* "Transamerica Insurance Group." There is simply no evidence, substantial or otherwise, as to the financial condition of Transamerica Insurance Company.

Tomasellis recognize that the annual report contains no evidence of appellant's financial condition but assert that we may nevertheless uphold the award. Their first contention is waiver: there was no objection to introduction of the annual report.[11] However, the rationale of the *Adams* court concerning the *purpose* of punitive damages leads us to conclude a private litigant's error or omission, such as failure to object to irrelevant evidence, cannot obviate the public's interest in meaningful judicial oversight of punitive damage awards. *Adams* explained that the function of punitive damages is "a purely *public* one . . . to punish wrongdoing and thereby to protect itself from future misconduct." (*Adams* v. *Murakami, supra,* 54 Cal.3d at p. 110, italics in original.) Requiring financial data assures this interest is served. The public may be well served by an award which punishes and deters, but not by one which cripples or destroys a defendant. Hence the courts must be able meaningfully to review awards with both considerations in mind. (*Id.* at p. 112.) As *Adams* explained: "Sound judicial policy weighs in favor of fully informed decisions, especially when a public interest is at stake. One state's high court explained, 'Indeed, the public policy nature of the award places in question the jurisdiction of the district court to award relief in the form of punitive damages

---

[11]Tomasellis also contend appellant *stipulated* the report would suffice as evidence of financial condition. We find no record of such a stipulation. The claim is that we can "infer" such a stipulation from the fact they had planned to call witnesses and introduce documents on net worth but instead used the annual report. This is too slender a basis on which to infer such a stipulation. Moreover, use of the annual report also permits a different inference: Tomasellis used this document for tactical advantages—to allow them to argue for an award based on the much higher net worth of the parent company. We note Tomasellis did indeed seize upon this advantage by citing to the *parent company's* net worth, revenues and incomes between 1987 and 1990, when arguing to the jury how it should decide on the appropriate punitive damage award.

in the absence of proof of the wealth or financial condition of the defendant.' [Citation.]" (*Ibid.*, quoting *Adel* v. *Parkhurst* (Wyo. 1984) 681 P.2d 886, 892.)

The *Adams* court concluded: "[Because] the primary interest that must be protected is the public interest in punitive damage awards in appropriate amounts[,] [w]e cannot allow the *public* interest to be thwarted by a defendant's oversight or trial tactics." (*Adams* v. *Murakami, supra,* 54 Cal.3d at p. 115, fn. 5, italics in original.) Although the *Adams* comments were directed to a slightly different issue (whether appellant had preserved the "excessiveness" argument for appeal), the ruling is, we believe, applicable in our situation. Because of the public's interest in meaningful scrutiny of punitive damage awards, a private litigant cannot by inaction waive the requirement of financial data as a prerequisite to any award.

As a second tack, Tomasellis point out the annual report does describe the financial condition of "Transamerica Insurance Group," and contend that the award can be supported on the theory that Transamerica Insurance Group and appellant were alter egos.[12] *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072 [234 Cal.Rptr. 835] is cited in support of the proposition that a parent company's assets can be the basis for a punitive damage award where alter egos are involved. *Downey Savings* evaluated whether an award of punitive damages was excessive by examining a parent company's income, having concluded the evidence showed "[f]or all intents and purposes [the subsidiary and parent] companies were one and the same." (*Id.* at p. 1100.) We do not, however, find this decision persuasive or controlling.

First, there is no indication the issue of "alter ego" was actually litigated and decided at trial in *Downey Savings.* Since it appears alter ego had *not* been an issue litigated or decided below, the appellate determination of this peculiarly factual issue appears to have been de novo, in apparent disregard

---

[12]Tomasellis cite as evidence of alter ego: (a) use of forms and letterhead bearing the umbrella name of "Transamerica Insurance Group"; (b) internal communications from Watanabe to Kirk and Hamilton were on forms using "Transamerica Insurance Group" and "Transamerica Insurance Services" stationery; and (c) Hamilton indicated she was representing "Transamerica Insurance Group" in her initial correspondence with Tomasellis. Tomasellis also seize on passages in the annual report as allegedly demonstrating that the various entities commingled funds, represented themselves as being a single entity, and shared some common officers and directors. However, Tomasellis misapprehend the true import of these passages. For example, the language they cite as evidence of "commingling" merely reflects that the parent company receives money from subsidiaries in the form of dividends and interest on loans, and reinvests some portion of those funds in the subsidiaries. These are precisely the kinds of transactions which would occur among entities which respect the corporate separateness among entities.

of fundamental rules of due process (i.e., notice and opportunity to litigate the alter ego question) and in violation of the prohibition against factfinding on appeal when the parties have not waived a jury below. (Code Civ. Proc., § 909.) Moreover, the *Downey Savings* court reached its conclusion without mentioning whether the parent company had controlled the litigation as required by due process considerations. (See *NEC Electronics Inc.* v. *Hurt* (1989) 208 Cal.App.3d 772, 778-780 [256 Cal.Rptr. 441] [even if alter ego is shown, liability cannot be imposed against absent party unless party controlled underlying litigation].)

In addition to its procedural defects, *Downey Savings* is substantively flawed. The "evidence" of alter ego in *Downey Savings* was that the parent company owned 100 percent of the subsidiary's stock, it shared office space and policy manuals with the subsidiary, they had some common personnel, and they had consolidated financial statements. (*Downey Savings, supra,* 189 Cal.App.3d at p. 1100.) This is woefully short of the showing on which alter ego normally rests. ■ Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person. (See generally, 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, §§ 12-23, pp. 524-537.) To prevail on a claim of "alter ego," the third party must show (1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected. (*Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 836-837 [26 Cal.Rptr. 806].) Certainly the facts of each case vary.[13] ■ However, in *Downey Savings* there was no showing of such critical facts as inadequate capitalization, commingling of assets, disregard of corporate formalities, nor any of the other facts which demonstrate the critical element: that an inequitable result would have followed if the corporate separateness had been respected. We decline to follow *Downey Savings.*

Here, alter ego was not litigated or decided, nor is there any significant showing of unity of interest. More importantly, there is nothing to suggest how an "injustice" would befall Tomasellis if the punitive damage award

---

[13]The factors which may show the "unity of interest" issue vary according to each case and are fact specific. (210 Cal.App.2d at p. 837.) Among the facts which can be considered are financial issues (e.g., was the corporation adequately capitalized?); corporate formality questions (e.g., was stock issued, are minutes kept and officers and directors elected, are corporate records segregated?); ownership issues (e.g., what is the stock ownership picture?); commingling issues (e.g., are corporate assets commingled, does the parent company merely use the corporate shell of the subsidiary to obtain goods and services for the parent company?); etc. (*Id.* at pp. 838-840.) If these factors show a unity of interest, and it is also shown that honoring the corporate shell would promote a fraud or injustice, the third party may be permitted to "pierce the corporate veil" and hold the parent entity liable for the corporate activities. (*Id.* at p. 842.)

were limited to a percentage of appellant's value rather than that of the parent company. (Accord, see *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 120 [172 Cal.Rptr. 74].)

Accordingly, we must reverse the portion of the judgment based on the punitive damage verdict. We would order a new trial as to this issue except for our conclusion, *infra*, that there is an even more crucial failing in the plaintiff's punitive damage showing.

### B. *Inadequacy of Evidence to Support Punitive Damages*

■ After a review of the entire record we conclude that the jury was not adequately advised, and presumably was misled, concerning the showing necessary for a finding of punitive damages. Notwithstanding accurate instructions by the court on the subject of punitive damages, the presentation to the jury in terms of evidence and argument did not adequately distinguish between the evidence necessary to support a tortious bad faith finding and that required for imposition of punitive damages. As a result, the jury was permitted to award punitive damages in a case devoid of the kind of evidence required for such finding.

Civil Code section 3294, subdivision (c)(1) provides that "conduct which is intended by the defendant to cause injury to the plaintiff" constitutes malice, and malice is a basis for an award of punitive damages. In the ordinary ex delicto action, therefore, involving intentionally wrongful conduct, the evidence sufficient to establish the tort is usually sufficient to support punitive damages.

The conduct required to award punitive damages for the tortious breach of contract, however, is of a different dimension. It has been examined many times in appellate decisions, and we but summarize. ■ First, simple breach of contract, no matter how willful and hence tortious, is not a ground for punitive damages. Such damages are accessible only upon a showing that the defendant "act[ed] with the intent to vex, injure, or annoy." (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

Punitive damages for failure to pay or properly administer an insurance claim are ordinarily, as in this case, based on "malice" or "oppression," rather than on the third possible ground for the award, "fraud." Both "malice" and "oppression" are defined in Civil Code section 3294 as involving "despicable conduct," which in the case of malice "is carried on by the

defendant with a willful and conscious disregard of the rights or safety of others," and as to oppression is "conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."

"Despicable conduct" is defined in BAJI No. 14.72.1 (1989 rev.) as "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." Such conduct has been described as "[having] the character of outrage frequently associated with crime." (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854].) ■ As well stated in *Flyer's Body Shop Profit Sharing Plan* v. *Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1154 [230 Cal.Rptr. 276]: "[A] breach of a fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages. [Citation.] The wrongdoer ' "must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]" ' Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate."

It is notable that punitive damages have been assessed against insurance companies most commonly where a showing has been made of a continuous policy of nonpayment of claims. Cases illustrating an established practice of claims stonewalling are collected in *Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 329 [5 Cal.Rptr.2d 594], where the court suggested approval of an earlier inference to the effect that " 'a consistent and unremedied pattern of egregious insurer practices' [is required] in order for the insurer's 'bad faith' conduct to rise to the level of malicious disregard of the insured's rights so as to warrant the imposition of punitive damages." (Citing *Patrick* v. *Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1576 [267 Cal.Rptr. 24].)

■ Finally, it is significant that the Legislature amended Civil Code section 3294 in 1987 to add the requirement that punitive damages be proved by "clear and convincing evidence." While this change may not have altered the standard of our review (all we are required to find is substantial evidence to support a determination by clear and convincing evidence [*Patrick* v. *Maryland Casualty Co., supra*, 217 Cal.App.3d at p. 1576]), it assuredly emphasized the greater and more convincing proof desired at the trial level. (See *In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198] [" 'Clear and convincing' evidence requires a finding of high probability . . . requiring that the evidence be 'so clear as to leave no substantial

doubt'; 'sufficiently strong to command an unhesitating assent of every reasonable mind.' "].)[14]

With this background of law and authority in mind, we review the facts of this case, construing them most favorably to the plaintiffs.　▉　First, we note there was no showing that the inadequacy of appellant's claims administration was part of a course of conduct. No evidence was introduced as to appellant's handling of other claims. This is not a case, therefore, in which punitive damages are warranted to punish for the maintenance of evil policies which damage the public in general.

We have reviewed the specific practices of which plaintiffs complain in an earlier portion of this opinion, in which we identified facts sufficient to support a judgment for bad faith claims administration. Nothing was revealed therein, however, which adds up to malice, oppression or despicable conduct. Surely the retention of outside legal counsel to investigate a questionable case cannot be deemed malicious—even admitting that the counsel so retained had a reputation for digging up reasons to deny coverage. The taking of the EUO is a recognized and acceptable practice in claims investigation, and if done in an inappropriate case amounts to nothing more than overzealousness. Plaintiffs complain that the appellant did not follow up its representations that it had never received the insurance endorsement on which appellant relied. Again, such conduct evidences only negligence or slipshod investigation. As noted in *Patrick* v. *Maryland Casualty Co.*, *supra*, 217 Cal.App.3d at page 1576, claims handling that is "witless and infected with symptoms of bureaucratic inertia and inefficiency" does not add up to malice or oppression.

In summation, the actions of appellant may be found to be negligent (failing to follow up information provided by the insured), overzealous (taking an unnecessary deposition under oath of the insured), legally erroneous (relying on an endorsement which was not shown to have been delivered), and callous (failing to communicate). There was nothing done, however, which could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure. There is simply no evidence supporting a punitive damage award in this case, and the award must be reversed in its entirety.

---

[14]An excellent explanation of the entitlement to punitive damages is contained in *Travelers Indem. Co.* v. *Armstrong* (Ind. 1982) 442 N.E.2d 349, 362, including the following comment: "[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing."

10. *The Attorney Fee Award Must Be Retried\**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## III

### DISPOSITION

The award of punitive damages is reversed. The order establishing attorney fees and costs is reversed, and this issue is remanded to the trial court for reconsideration. In all other respects the judgment is affirmed. All parties shall bear their own costs on appeal.

Work, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied July 1, 1994, and respondents' petition for review by the Supreme Court was denied September 8, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

\*See footnote, *ante*, page 1269.