Thomas **ANDERSON**, Plaintiff–
Appellee/Appellant,

v.

**ALLSTATE INSURANCE COMPANY,**
an Illinois Corporation, Defendant–
Appellant/Appellee.

Nos. 01–15145, 01–15246,
01–15307, 01–15330.

D.C. No. CV–00–00907–PAN.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Decided Sept. 3, 2002.

---

Before CANBY, GRABER, and PAEZ, Circuit Judges.

## MEMORANDUM *

Allstate Insurance Company appeals the district court's judgment, entered after a jury trial, in favor of Thomas Anderson in Anderson's diversity action for breach of the implied covenant of good faith and fair dealing arising from Allstate's insurance of Anderson's residence.[1] The jury found that Allstate acted maliciously and oppressively in not fully compensating for repairs, particularly including elimination of mold, after a water pipe broke in Anderson's home. The jury awarded Anderson compensatory damages of $484,853.96 and punitive damages of $18 million. The district court reduced the punitive damages award to five times the compensatory damages. Allstate appeals both awards, and Anderson cross-appeals the district court's reduction of punitive damages. We affirm the compensatory award and reverse the punitive damages award.

### Factual Background

Plaintiff Thomas Anderson purchased an Allstate Deluxe Homeowners Policy in June 1996. The policy covered water damage from freezing, with an exclusion of coverage for freezing damage if the house was unoccupied and the owner failed to take reasonable care to maintain heat.

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir. R. 36–3.

1. Allstate does not contest on appeal the jury's finding that Allstate breached the contract of insurance.

Sometime in January 1997, a pipe in Anderson's attic broke and sprayed water into the house. On January 17, 1997, one of Anderson's neighbors saw water running down the outside of the house and called the local water district to have the water turned off. Anderson and his son discovered the damage on February 1 and reported the loss to Allstate. Allstate sent an emergency service company, Service-Master, to Anderson's home. ServiceMaster pulled up the carpet and applied a substance to remove the mold on the walls and floor. While applying the anti-microbial substance to the mold, ServiceMaster became concerned that there might be asbestos in the floors and ceilings. Later, an environmental management service determined that there was asbestos in the floor tile and in the ceiling materials. The environmental management service recommended that all soft goods be removed as hazardous materials and that all hard goods be decontaminated.

Allstate assigned the claim to Glen Plumlee, an independent adjuster, who inspected the home. He documented that the pipe in the attic had ruptured and that water had sprayed into the house for several days. He also reported that all the carpets were soaked, the cabinets were swelled and splitting, and all the walls had mold and mildew. Plumlee also noticed the near-total absence of furniture or other amenities, leading him to question whether the house had been occupied. A Service-Master worker told Plumlee that Anderson's son had said that furniture had been moved out of the house while the son renovated and repainted the interior for his father.

In March 1997, Plumlee reported inconsistencies in damage reports and repair evaluations for household contents and recommended referral of the claim to Allstate's Special Investigations Unit ("SIU").

The matter was assigned to Brenda Burg, an SIU claims agent, who assumed responsibility for the entire claim, both structure and contents.

The process of adjustment became contentious; Anderson and his son insisted that Allstate was "jerking [Anderson] around," while Allstate contended that Anderson and his son were being evasive and had overstated claims for damages to contents. Allstate continued throughout to question coverage on the ground that the house had been unoccupied, but failed to resolve the matter or to refute Anderson's statement that the heat had been on in the house. At first, Allstate undertook to repair in accordance with estimates supplied by Anderson and Allstate's adjuster, but its first offer of payment to Anderson came with a warning that it would take the money back if it determined that there was no coverage. Subsequently, a check was sent to Anderson on a "take it or leave it" basis, and it was not enough to cover the repairs known by Anderson to be necessary at that time. Much later, when more extensive mold damage was discovered, an Allstate adjuster named Hirsch rejected Anderson's offers of evidence of additional required repairs, saying that Anderson had been offered all he was going to get. Videotapes of mold damage submitted to Allstate by Anderson's contractor were ignored.

Anderson, who could not inhabit his residence because of mold, then brought this action in June 1999. After the verdict in favor of Anderson, Allstate moved for judgment as a matter of law on the bad faith and punitive damages claims. The district court denied the motion but reduced the punitive damages, entering its final judgment in January 2001.

### Tort Damages

California law imposes on each party to a contract an implied duty of good faith and fair dealing. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal.App.4th 335, 108 Cal. Rptr.2d 776, 783 (2001). Thus Allstate had a duty to "act fairly and in good faith in discharging its contractual responsibilities" under its policy. *Id.* (citation and internal quotation marks omitted). The " 'ultimate test of bad faith liability in the first party cases is whether the refusal to pay policy benefits . . . was unreasonable' and not as a result of mere negligence or bad judgment." *Adams v. Allstate Ins. Co.*, 187 F.Supp.2d 1219, 1226 (C.D.Cal.2002) (quoting *Chateau Chamberay*, 108 Cal.Rptr.2d at 783); *see also Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal.App.4th 847, 93 Cal.Rptr.2d 364, 386–87 (2000); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 31 Cal.Rptr.2d 433, 440 (1994).

The record contains sufficient evidence for a jury to find that Allstate's conduct amounted to more than a simple mistake or legitimate dispute as to coverage and damages. The jury could properly find that Allstate breached its duty of good faith and fair dealing by acting unreasonably when handling Anderson's claim. Allstate's actions of refusing to resolve the issue of coverage, refusing to consider evidence of additional loss, offering settlement while withholding a final determination of coverage, pressuring Anderson to pay for an appraisal while still withholding a final determination of coverage, and failing to communicate concerning exposure to asbestos and mold, all support a finding of bad faith liability.[2]

### Investigation is a Critical Factor

One of the most critical factors in determining the unreasonableness of an insurer's conduct is the adequacy of its investigation of the claim. *Shade Foods*, 93 Cal.Rptr.2d at 386–87. The evidence supports a finding that Allstate, like the insurer in *Shade Foods*, failed to conduct a reasonable investigation of Anderson's claim in accordance with its duty. Allstate did not deny coverage outright, but left the issue open. As of the time of litigation, Allstate had still not determined coverage. Allstate initially responded in a reasonable manner by sending out an emergency response crew, ServiceMaster, and dispatching an independent adjuster, Glenn Plumlee. It also did not close its investigation until more than a year after the loss. But as time wore on, the deficiencies in Allstate's investigation became clearer, and there was sufficient evidence for the jury to find that Allstate was guilty of bad faith in that regard.

Allstate's pattern of investigation on Anderson's claim suggests that it was looking for reasons to deny Anderson's claim rather than to find coverage. Evidence presented to the jury was sufficient to show that Plumlee's investigation appeared to be focused on the occupation issue, and did not respond in good faith to the evidence offered by Anderson. Allstate offered little evidence to support its theory that the loss was a freeze loss and that the home was not heated.

All of the evidence at trial did not point in the same direction, but there was sufficient evidence in the record for the jury to find that Allstate's investigation was unreasonable in the several respects that we have already described. Anderson's evi-

---

**2.** Our conclusions regarding sufficiency of the evidence are based on our review of the entire trial record. We do not recite here every detail that supported the jury's finding of bad faith.

dence tends to show that Allstate ignored information that would have led to coverage and to further liability for damage.

*Consistent and Inflexible Position*

The actions of an insurer in failing to consider evidence supporting coverage, and in maintaining a consistent and inflexible position with the insured, can amount to bad faith. *See Shade Foods,* 93 Cal. Rptr.2d at 389. Anderson presented sufficient evidence to show that Allstate consistently refused to affirm or deny coverage without another examination under oath and that Allstate refused to consider evidence of additional damage. Anderson presented evidence at trial that Allstate consistently refused to accept evidence of additional loss and refused to approve the replacement of sagging, moldy sheetrock.

This inflexibility is also reflected in Allstate's request for an appraisal to determine the sheetrock replacement issues prior to its resolution of the coverage issue. Allstate informed Anderson that if Anderson did not want to accept Allstate's final offer of payment for the loss, then Allstate would start the appraisal process to settle the payment issue. The appraisal process required Anderson to pay for an appraisal of the damage, which would then be compared to Allstate's appraisal. Allstate's own expert witness testified that the appraisal could cost $1,000 for a regular appraisal and that the costs for a formal appraisal could go "into never, never land." Allstate, however, had still not determined that the loss was covered under Anderson's policy. The appraisal process could only resolve questions of damage, not coverage. Allstate consistently refused to discuss the coverage issues with Anderson, even when it sent a check that was accompanied by a letter informing Anderson that he would have to return the money if Allstate denied coverage. Several expert witnesses at trial testified to the unreasonableness of Allstate's actions.

Allstate's refusal to discuss the coverage issues, failure to investigate the cause of the loss, refusal to review additional evidence of loss, and its offer to settle the claim with an expensive appraisal support a finding that Allstate acted unreasonably and in bad faith.

*Evaluation of Allstate's Actions at the Time They Occurred*

The trier of fact must evaluate Allstate's actions at the time Allstate made the decisions concerning Anderson's claim. *Chateau Chamberay,* 108 Cal.Rptr.2d at 784. Allstate contends that its actions in failing to respond to the supplemental claims of mold damage were reasonable because much less was known about treatment of mold at that time than is known now. Expert testimony at trial was sufficient, however, to show that Allstate's actions were unreasonable at the time the decisions were made.

Testimony showed that there was sufficient awareness in the insurance industry concerning the problems of mold to inform Allstate of the inadequacy of a remedy of simply applying an anti-mold solution to moldy sheetrock and then sealing it, as Allstate's adjuster had suggested to Anderson.[3] The district judge and counsel for both sides reminded the expert witnesses to address mold awareness in the industry at the time of the investigation and initial damage estimation (February through June 1997).

*Genuine Dispute Doctrine*

■ California law recognizes that an insurer is not liable in bad faith when it

---

**3.** One of the adjusters, Plumlee, suggested spraying bleach on the mold, an ineffective and counter-productive method according to one expert. At trial, even Plumlee testified that bleach-treated mold eventually returns.

denies or delays paying policy benefits because of a genuine dispute as to coverage or liability. *Chateau Chamberay*, 108 Cal. Rptr.2d at 784 (citing *Fraley v. Allstate Ins. Co.*, 81 Cal.App.4th 1282, 97 Cal. Rptr.2d 386, 391 (2000)). "Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith." *Fraley*, 97 Cal.Rptr.2d at 392; *see also Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir.2001).

What we have said already indicates that there was sufficient evidence from which a jury could find that Allstate's inflexible position went beyond a genuine dispute over coverage. If Allstate had attempted to resolve the coverage issue instead of leaving it hanging over Anderson's head, it would have investigated and made decisions on whether the house was unoccupied and whether Anderson had failed to keep the house heated. Particularly with regard to the heat, Allstate did nothing. Allstate cannot rely on the opinions of its adjusters if they are not supported by adequate investigation. Anderson presented evidence at trial that he left the wall heaters on when he was not at home, which was consistent with what he and his son had been telling Allstate all along. The jury could properly find that the coverage dispute was not genuine.

*Conclusion — Bad Faith*

Substantial evidence supports the jury's finding that Allstate breached its duty of good faith and fair dealing in handling Anderson's claim. We therefore affirm the district court's award of compensatory damages.

### Punitive Damages

■ Under California law, a plaintiff must establish by clear and convincing evidence malice, oppression or fraud on the part of the insurer in order to recover punitive damages. *Adams*, 187 F.Supp.2d at 1230–31. The relevant California statute defines malice as "conduct which is intended . . . to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ.Code § 3294(c)(1). Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ.Code § 3294(c)(2).

■ We reverse Anderson's punitive damage award because the award is not supported by substantial evidence. "Substantial evidence is 'such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'" *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir.1999) (en banc) (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987)).

■ A finding of bad faith does not automatically entitle a plaintiff to punitive damages. *Tomaselli*, 31 Cal.Rptr.2d at 443. "The conduct required to award punitive damages for the tortious breach of contract . . . is of a different dimension" than that required to find bad faith. *Id.* at 443. The defendant's actions must be more than negligent or even callous. The conduct must be such that it "could be described as evil, criminal, recklessly indifferent to the rights of the insured, or [having] a vexatious intention to injure." *Id.* at 445.

Evidence of Allstate's failure to warn Anderson of asbestos exposure, refusal to deal with the increasing mold problem, and attempts to coerce a settlement does not reach the level of "despicable conduct that

subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ.Code § 3294(c)(2). "Despicable conduct" under § 3294(c)(2) means "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Tomaselli*, 31 Cal.Rptr.2d at 444. "Such conduct has been described as '[having] the character of outrage frequently associated with crime.'" *Id.* (alteration in original) (quoting *Taylor v. Superior Court*, 24 Cal.3d 890, 157 Cal.Rptr. 693, 598 P.2d 854, 856 (1979)). "'Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.'" *Id.* (quoting *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.*, 185 Cal. App.3d 1149, 230 Cal.Rptr. 276, 278 (1986)).

Allstate's conduct does not reach the level required for an award of punitive damages. There is no substantial evidence that Allstate acted with malice, oppression, or fraud in handling Anderson's claim. The health hazards of mold were less clear at the time of Allstate's actions than they later became. Some of Allstate's actions are inconsistent with a finding of malice or extreme indifference to Anderson's rights, including its payment of $28 per hour to Anderson's son for cleanup work when he had put in a claim at a lower rate, and its advice to Anderson's contractor to raise his original estimate to meet that of Allstate. Anderson presented sufficient evidence for a jury to find that Allstate later breached its duty of good faith and fair dealing, but even with regard to Allstate's later dealings, there was not enough evi-

dence for a jury to find that Allstate engaged in such despicable conduct that it should be punished with punitive damages.[4]

### Conclusion

We affirm the jury's award of compensatory damages, economic and non-economic, for breach of the implied covenant of good faith and fair dealing. We reverse the punitive damages award. The parties will bear their own costs on appeal and cross-appeal.

**AFFIRMED IN PART; REVERSED IN PART.**

---

4. Because we reverse the award of punitive damages for lack of evidence, we do not ad-

dress Allstate's other contentions concerning punitive damages.

