[No. D032817. Fourth Dist., Div. One. June 14, 2000.]

ERNEST FRALEY et al., Plaintiffs and Appellants, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

1284

**COUNSEL**

Levine, Steinberg & Miller and Harris I. Steinberg for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Peter H. Klee, Charles A. Danaher and William G. Peterson for Defendant and Respondent.

**OPINION**

**NARES, J.**—In this insurance bad faith case, Ernest Fraley and Linda Fraley appeal a summary judgment in favor of Allstate Insurance Company (Allstate). The principal issue is whether a homeowners policy required the Fraleys to repair or replace their damaged property within 180 days of a certain date as a prerequisite to obtaining replacement cost. We conclude it did, and accordingly affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 17, 1994, a fire extensively damaged the Fraleys' home. The loss was covered by their deluxe homeowners policy with Allstate. It provides in pertinent part:

"5. How We Pay For a Loss

"Building Structures

"Payment for covered loss to building structures insured under the Dwelling Protection coverage will be by one of the following methods:

"a) Replacement Cost. This means there will not be a deduction for depreciation. [¶] Payment will not exceed the smallest of the following amounts: [¶] 1) the replacement cost of that part of the building structure damaged for equivalent construction and use on the same premises; [¶] 2) the amount actually and necessarily spent to repair or replace the damaged building structure; or [¶] 3) the limit of liability applicable to the building structure.

"We will not pay more than the actual cash value of the damaged building structure until the repair or replacement is completed.

"b) Actual Cash Value. This means there may be a deduction for depreciation.

"If you do not repair or replace the damaged building structure, payment will be on an actual cash value basis, not to exceed the limit of liability shown on the declarations page for Coverage A—Dwelling Protection. You may make a claim for any additional payment on a replacement cost basis if you repair or replace the damaged building structure within 180 days of the actual cash value payment."[1]

Allstate promptly investigated the claim, but the parties' contractors could not agree on the scope or cost of repair. In the meantime, Allstate's appraiser set actual cash value of the home at $200,000. In September 1994, Allstate paid the Fraleys $164,822, the amount of its latest repair estimate. In December 1994, however, Allstate conceded the minimum repair cost was $199,671.94. It sent the Fraleys a check for $35,178, explaining that it, "together with the $164,822 previously paid . . . , represented payment of the actual cash value [of $200,000] . . . ." Allstate advised the Fraleys they were entitled to additional benefits under the policy if they actually repaired or replaced their home.

The Fraleys, whose final repair estimate was approximately $490,107, exercised their right to have the claim submitted to a panel of three apprais- ers. The hearing was delayed until late 1996 because of the Fraleys' "two successive attempts to disqualify Allstate's appraiser (one successful, one unsuccessful), [the Fraleys'] . . . fallout with their own appraiser, and the withdrawal of the original appraisal umpire." On February 25, 1997, the appraisers set the actual cash value at $200,000 and the replacement cost at $364,500.

On March 4, 1997, Allstate advised the Fraleys as follows: "The Appraisal Award indicates the actual cash value loss at $200,000 . . . . That amount was paid to you . . . as of December 8, 1994. Pursuant to the terms of the policy, no additional payments will be made until repair or replacement of the damaged building structure is completed." On April 8, 1997, Allstate

---

[1]In *Hess v. North Pacific Ins. Co.* (1993) 122 Wn.2d 180 [859 P.2d 586], the court explained the genesis of replacement cost provisions of fire policies: "Traditional coverage was for the actual or fair cash value of the property. The owner was indemnified fully by payment of the fair cash value, in effect the market value, which is what the owner lost if the insured building was destroyed. [Citation.] [¶] However, it was recognized that an owner might not be made whole because of the increased cost to repair or to rebuild. Thus, replacement cost coverage became available. 'Replacement cost coverages . . . go beyond the concept of indemnity and simply recognize that even expected deterioration of property is a risk which may be insured against.' " (*Id.* at p. 587.)

informed the Fraleys that under the terms of the policy, they had 180 days following payment of the actual cash value of the property to repair or replace their home. However, because the 180-day period had already expired, Allstate offered to stipulate that the time would run from the service of the appraisal award.

On April 17, 1997, the Fraleys' counsel, Bruce Cornblum, sent Allstate a letter stating: "Given the fact that the actual cash value was paid in December 1994 to the Fraleys, and the [appraisers'] award was not rendered until [February 10, 1997], and the confirmation will be rendered April 28, 1997, I would agree that the 180 day time period commences as of the date of confirmation. It was my opinion to Mr. Fraley that such would be the commencement date . . . ." Allstate agreed to treat April 28, 1997, as the date the limitation period began to run, without consideration of whether the award was confirmed. Although not required by the policy, in May 1997 Allstate also agreed to fund reconstruction of the Fraleys' home by making periodic payments to the contractor or setting up an escrow fund.

The parties apparently had no further contact until September 26, 1997, when the Fraleys notified Allstate they had "finally been able to secure a general contractor to rebuild our home" and completion was expected by March 30, 1998. The Fraleys said they were "hopeful that [the project] will proceed in accordance with the time specified in the contract." On October 14, 1997, Allstate advised the Fraleys that because reconstruction could not be completed by October 25, 1997, the end of the stipulated 180-day period, replacement cost benefits were no longer available. On October 22, 1997, Cornblum wrote to Allstate that in order to preserve their right to replacement cost, the Fraleys purchased another home.[2] Allstate paid them the difference between the $200,000 previously paid and the replacement cost award.

The Fraleys obtained new counsel and sued Allstate for breach of contract, breach of the implied duty of good faith and fair dealing and fraud. The Fraleys accused Allstate of unfairly delaying payment and forcing them to purchase a less desirable home by misrepresenting that the 180-day provision applied to a claim made under the replacement cost provision of the policy.

Allstate moved for summary judgment. The court granted the motion, determining the 180-day provision applied to the Fraleys' claim and Allstate

---

[2] In *Conway v. Farmers Home Mut. Ins. Co.* (1994) 26 Cal.App.4th 1185, 1192 [31 Cal.Rptr.2d 883], this court held that under a replacement cost provision the insured has the option of purchasing a replacement dwelling at another location.

acted reasonably under the undisputed facts. Judgment was entered in Allstate's favor on November 19, 1998.

## DISCUSSION

### I

A summary judgment motion is appropriate if "[the cause of] action has no merit . . ." (Code Civ. Proc., § 437c, subd. (a)); that is, if "[o]ne or more of the elements of the cause of action cannot be separately established. . . ." (Code Civ. Proc., § 437c, subd. (n)(1).) "The motion . . . shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) ▮ We review the trial court's ruling on the summary judgment motion, and its interpretation of the insurance policy, de novo. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Truck Ins. Exchange v. Pozzuoli* (1993) 17 Cal.App.4th 856, 859 [21 Cal.Rptr.2d 650].)

### II

▮ The Fraleys concede they were not entitled to replacement cost until they actually repaired or replaced their home. (See *Myers v. Allstate Ins. Co.* (C.D.Cal. 1997) 989 F.Supp. 1250, 1253-1254.) In their view, however, the 180-day limitation period is inapplicable because they sought replacement cost under subdivision (a) of paragraph 5 of section I of the policy, which contains no express reference to it. Rather, the 180-day period appears only in subdivision (b) of paragraph 5 of that section, the actual cash value provision. The Fraleys also point out that the preface to subdivisions (a) and (b) of section I, paragraph 5 provides, "Payment for covered loss to building structures insured under the Dwelling Protection coverage will be by *one* of the following methods . . . ." (Italics added.)

▮ "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.] . . . [¶] The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. '. . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

"If the policy is ambiguous (i.e., susceptible to more than one reasonable interpretation), the ambiguity is construed in favor of coverage. [Citation.]

[¶] However, the predicate to interpreting ambiguities in favor of coverage is that the policy be *reasonably* susceptible to more than one interpretation. Where a policy clearly excludes coverage, we will not indulge in tortured construction to divine some theoretical ambiguity in order to find coverage." (*Titan Corp. v. Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 469 [27 Cal.Rptr.2d 476], original italics.)

 Contrary to the Fraleys' position, subdivision (a) of paragraph 5 of section I of the policy cannot be considered in isolation. Rather, we interpret insurance contracts "as a whole, with each clause lending meaning to the others. [Citation.] Importantly, we should interpret contractual language in a manner which gives force and effect to every clause rather than to one which renders clauses nugatory." (*Titan Corp. v. Aetna Casualty & Surety Co., supra,* 22 Cal.App.4th at pp. 473-474.) Indeed, the interrelation of subdivisions (a) and (b) of section I, paragraph 5 is illustrated by the description in subdivision (a)(1) through (3) of Allstate's replacement cost payment obligation, necessarily applicable to both subdivisions (a) and (b).

We conclude that section I, paragraph 5 of the policy, read as a whole, unambiguously required the Fraleys to comply with the 180-day requirement. As explained in *Myers v. Allstate Ins. Co., supra,* 989 F.Supp. 1250, payment provisions such as the one here preclude recovery of replacement cost without proof of the insureds' actual repair or replacement of the damaged or lost property. To ameliorate the hardship to the insureds, however, the insureds may initially obtain the actual cash value of the property and use it "to begin the process of repair or replacement, at which point [they] could submit claims for expenditures that went above the actual cash value of the loss." (*Id.* at p. 1254; see also *Maryland Cas. Co. v. Knight* (9th Cir. 1996) 96 F.3d 1284, 1293.)

Although the Fraleys ultimately sought the cost of reconstructing their property, they initially accepted the $200,000 actual cash value from Allstate. The claim was thus adjusted under subdivision (b) of section I, paragraph 5 of the policy, which contains the 180-day limitation. The Fraleys' claim that the $200,000 was a partial payment of replacement cost is without merit. Again, the policy states that Allstate "will not pay more than the actual cash value of the damaged building structure until the repair or replacement is completed." Moreover, as noted, the Fraleys' previous counsel expressly acknowledged that the $200,000 represented the actual cash value of their home. Indeed, the Fraleys, through their prior counsel, agreed that the 180-day provision was applicable and stipulated to the date it would begin running.

The Fraleys' reliance on Allstate's claims adjusting manual is misplaced. ■ Extrinsic evidence may be admitted to aid in the interpretation of an insurance policy only where the terms are ambiguous. (*ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1790-1791 [22 Cal.Rptr.2d 206].) ■ As discussed, the policy here unambiguously required the Fraleys to comply with the 180-day requirement.[3] In any event, the claims manual supports that conclusion: "Losses to building structures will be settled on an [actual cash value] basis, not to exceed the limit of liability shown on the Declarations Page for Coverage A, if the insured doesn't want to replace the damaged property. Occasionally, insureds suffer losses to property which they do not wish to replace. If the insured does decide to replace, he or she can apply for the difference between [actual cash value] and full replacement cost if the building structure is repaired or replaced within 180 days of the [actual cash value] payment."

In sum, Allstate did not misrepresent the terms of the policy to the Fraleys. Therefore, breach of contract, breach of the implied covenant of good faith and fair dealing and fraud claims based on the ostensible misapplication of the 180-day provision are barred as a matter of law.

### III

■ Alternatively, the Fraleys contend there were triable issues of fact regarding whether Allstate acted in bad faith by hiring "captive" contractors and "low balling" the repair estimates. They rely solely on the differential between Allstate's original repair estimate of $115,000 and the replacement cost arbitration award of $364,500.

The Fraleys cite no authority for their position. ■ "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1693, fn. 3 [44 Cal.Rptr.2d 575]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.) ■ Even absent waiver, however, the Fraleys' claim is unavailing.

■ "The covenant of good faith and fair dealing is implied in law to assure that a contracting party 'refrain[s] from doing anything to injure the

---

[3]For the same reason, we need not address the Fraleys' argument regarding amendments Allstate made to the standard policy language after the date of the policy here.

right of the other to receive the benefits of the agreement.' [Citation.] In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract. Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract—i.e., prompt compensation for losses." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246], original italics.)

In a bad faith case, the "primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. [Citation.] Where benefits are withheld for proper cause, there is no breach of the implied covenant." (*Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d at p. 1151.) It is well established that "bad faith liability cannot be imposed where there 'exist[s] a genuine issue as to [the insurer's] liability under California law.' [Citation.]" (*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205-1206 [10 Cal.Rptr.2d 352], citing *Safeco Ins. Co. of America v. Guyton* (9th Cir. 1982) 692 F.2d 551, 557, disapproved on other grounds in *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 410-411 [257 Cal.Rptr. 292, 770 P.2d 704].) "[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." (*Lunsford v. American Guarantee & Liability Ins. Co.* (9th Cir. 1994) 18 F.3d 653, 656.) The "genuine dispute" doctrine may be applied where the insurer denies a claim based on the opinions of experts. (See *Allstate Ins. Co. v. Madan* (C.D.Cal. 1995) 889 F.Supp. 374, 380; *Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 35 [148 Cal.Rptr. 653], disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 824, fn. 7 [169 Cal.Rptr. 691, 620 P.2d 141].)

Here, Allstate promptly hired contractors, Reconstruction Masters Incorporated (RMI) and Landmark Construction, Inc. (Landmark), and they rendered estimates of approximately $110,000 and $115,000, respectively. The Fraleys' contractor, Knight Construction of San Diego Incorporated (Knight), estimated repairs at approximately $227,000. After discussions regarding the extent of damage, RMI, Landmark and Knight increased their repair estimates to approximately $151,000, $164,822 and $235,763, respectively.

The Fraleys then provided Allstate with a $291,106.57 repair estimate by Shoreline General Contractors, Inc. (Shoreline). In response, Allstate had

Tim Behnke, of BR Building Repairs, Inc., "provide his expert opinion on the damage and scope." On November 14, 1994, Behnke rendered a $182,549 repair estimate. After comparing the various bids, in December 1994, Allstate conceded that the minimum repair cost was $199,671.94. At the 1997 appraisal, the Fraleys no longer relied on Shoreline. Rather, they submitted a reconstruction estimate of $490,107.37 by American Building Company.

The record plainly shows a genuine dispute regarding Allstate's contractual obligations. In fact, the Fraleys concede that the "dispute over the 'scope' of what needed to be repaired was in large part the reason why [they] were forced to demand appraisal on the Replacement Cost of their home." ■ Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. Despite the " 'special relationship' " (*Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d at p. 1147) between an insurer and its insureds, an insurer "may give its own interests consideration equal to that it gives the interests of its insured[s]." (*Id.* at pp. 1148-1149.)

■ The record reveals that Allstate handled the Fraleys' claim reasonably, by retaining experts and investigating, paying the undisputed actual cash value of the loss and proceeding to appraisal on the disputed portion of the claim, replacement cost. Moreover, Allstate promptly paid the replacement cost appraisal award after the Fraleys purchased another home. We agree with the trial court that their bad faith claim fails as a matter of law.

### DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and McDonald, J., concurred.