**Hal MAYNARD, Plaintiff,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation; and Does 1–100 inclusive, Defendants.**

**No. CV 06–7869 ABC RCX.**

United States District Court,
C.D. California.
Western Division.

July 30, 2007.

Peter H. Klee and Angela Smith of Luce, Forward, Hamilton & Scripps LLP., San Di8ego, CA, for State Farm Insurance Co.

John N. Quisenberry, Heather M. McKeon and Lourdes De Armas of the Quisenberry Law Firm, Los Angeles, CA, for Plaintiffs.

## ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COLLINS, District Judge.

On April 25, 2007, Defendant State Farm Mutual Automobile Insurance Co. ("State Farm") filed the instant motion for summary judgment. On June 25, 2007, Plaintiff Hal Maynard ("Plaintiff") opposed and State Farm replied on July 3, 2007. The hearing on this matter was held on

July 30, 2007. The Court hereby GRANTS State Farm's motion for summary judgment.

## I. FACTUAL BACKGROUND [1]

The material facts are undisputed and are as follows:

This dispute arose on May 23, 2003 when a motorist rear-ended Plaintiff's car in a parking structure while Plaintiff was stopped to pay the parking attendant. (State Farm's Undisputed Fact ("UF") ¶ 5.) While Plaintiff was stopped at the attendant's booth, the car behind him, driven by Bentley Mitchum, hit Plaintiff's rear bumper. (*Id.*) Neither the police nor an ambulance was called to the scene and Plaintiff drove himself home approximately 15 minutes after the accident. (*Id.*)

At the time of the accident, Plaintiff had $25,000 in medical payments coverage and $100,000 in uninsured/underinsured motorist (UM/UIM) coverage through his State Farm automobile insurance policy. (*Id.* ¶ 6.) Because Mitchum was at fault for the accident, Plaintiff first made a claim under Mitchum's insurance policy, Cencal Insurance, which had a liability limit of $15,000. (*Id.* ¶ 9.) On June 26, 2003, Plaintiff's counsel reported the accident to State Farm and made a claim under Plaintiff's UM/UIM coverage in his State Farm insurance policy. (*Id.* ¶ 7; Plaintiff's Additional Facts ("Add'l Facts") ¶ 6.[2])

On July 9, 2003, while inquiring into Plaintiff's claims, State Farm noted in Plaintiff's claims file that Plaintiff had been involved in a prior accident. (Add'l Facts ¶ 7.) The accident occurred in July 2002, and, prior to that, Plaintiff had a

history of neck and arm pain, as well as a degenerative disease in his neck and lower back. (UF ¶¶ 1–2.) Plaintiff's doctor stated that the July 2002 accident "dramatically" increased his pain from these pre-existing problems, and, in August 2002, Plaintiff's neurologist recommended that he have spinal surgery as a result of the accident. (*Id.* ¶¶ 3–4.) Plaintiff did not undergo the suggested surgery. (*Id.* ¶ 4.)

State Farm claims adjuster Jeanet Busslinger contacted Mitchum on July 16, 2003 to get information about the incident. (*Id.* ¶ 8.) Mitchum apparently told State Farm: (i) His car had stalled, causing him to roll into the back of Plaintiff's car; (ii) Plaintiff then got out of his car, but did not say anything to Mr. Mitchum about being hurt; and (iii) Plaintiff inspected under his car's bumper and in the trunk to verify that there was no damage. (UF ¶ 8.) On July 17, 2003, State Farm adjuster Marilyn Wilson contacted Mitchum and confirmed this information. (Add'l Facts ¶ 9.)

Cencal contacted State Farm on August 4, 2003, stating that Mitchum's coverage applied to the accident, but that it had not yet determined the amount of coverage. (Add'l Facts ¶ 10.) State Farm sent a letter that same day to inform Plaintiff's attorney that, based on information from Cencal, the UM/UIM coverage appeared not to apply at that time. (*Id.* ¶ 11.) On August 13, 2003, State Farm received medical records and bills from Plaintiff's physicians, but adjuster Melissa Mog noted in Plaintiff's file that they were incorrectly routed and, as of August 25, 2003, they had not yet been reviewed. (*Id.* ¶¶ 12–13.) Yet another claims adjuster,

---

1. Plaintiff has lodged objections to State Farm's Statement of Undisputed Facts. The Court has reviewed these objections and overrules them in their entirety.

2. Plaintiff submitted 62 additional facts labeled as "disputed," although many of them are clearly not. The Court will generally treat them as additional undisputed facts and will note any genuine conflict between the parties' factual submissions.

Pamela Hast, noted on October 17, 2003 that because Plaintiff was pursuing a property damage against Mitchum, his file should be left open for his medical injury claim. (*Id.* ¶ 14.)

On June 16, 2004, State Farm first obtained photos of Plaintiff's vehicle. (*Id.* ¶ 19.) A month later on July 15, 2004, State Farm contacted Mitchum about the damage to his vehicle. (*Id.* ¶ 22.) Apparently due to Plaintiff's failure to cooperate with Cencal, team manager Ron Herman recommended that State Farm issue a Reservation of Rights letter, which was issued on September 7, 2004. (*Id.* ¶ 23–25.) On September 15, 2004, State Farm inspected Plaintiff's vehicle and shortly thereafter received an estimate of the damage, which noted small scratches that would cost $473 to repair. (UF ¶ 19(vi).) State Farm withdrew the Reservation of Rights letter. (Add'l Facts ¶ 28.) On October 22, 2004, Cencal told State Farm that it did not think that Plaintiff's injuries were worth the $15,000 policy limits. (UF ¶ 13). Instead, through at least November 19, 2004, Cencal valued Plaintiff's claim as worth only $8,500 and offered to settle it for that amount. (*Id.*) Cencal ultimately settled with Plaintiff and, on June 14, 2005, agreed to pay Plaintiff Mitchum's full $15,000 policy limits. (*Id.* ¶ 14.)

Plaintiff's attorney contacted State Farm on June 14, 2005 and informed it that Plaintiff had approximately $11,000 in total medical bills so far and an unspecified loss of earnings, and that Plaintiff would be making a claim under his underinsured motorist coverage. (*Id.* ¶ 15.) Plaintiff's attorney then sent a demand package to State Farm requesting $85,000 under Plaintiff's underinsured motorist coverage. (*Id.* ¶ 16.) The letter claimed that Plaintiff was still suffering from the following injuries as a result of the May 2003 accident: neck pain, radiating pain and numbness to both arms, shoulder pain, back pain, headaches, dizziness, and vertigo. (*Id.*) The letter claimed that Plaintiff was going to need over $100,000 for future medical expenses for these injuries, including surgery on both arms, surgery on his cervical spine, surgery on his lumbar spine, physical therapy, and other pain management therapy. (*Id.*) The demand letter also asserted that the health problems caused by the May 2003 accident were interfering with Plaintiff's ability to work. (*Id.* ¶ 17.) The letter claimed that Plaintiff had lost around 100 hours of work so far, for a total claim of approximately $7,400 in lost wages (at $80 an hour). (*Id.* ¶ 17.) Plaintiff demanded arbitration if State Farm did not agree to the demand for $85,000, which was Plaintiff's demand for his State Farm policy limit of $100,000 minus his $15,000 settlement with Cencal. (*Id.* ¶ 18.)

Plaintiff also pursued a medical payments claim under his State Farm policy, and State Farm paid him $7995 under his medical payments coverage for the May 2003 accident. (*Id.* ¶¶ 12.) As part of this claim, in March 2004, Plaintiff's attorney reported that Plaintiff had recently been discharged from medical care after Plaintiff's physician reported that: (i) Plaintiff had "improved," (ii) Plaintiff's "pain related to his motor vehicle accident of May 23, 2003 has finally diminished somewhat," and (iii) Plaintiff would "continue with a home exercise program" and only return to the physician's office on an as needed basis. (*Id.* ¶ 11.)

State Farm questioned the relationship between Plaintiff's extensive list of injuries and the minor impact of the parking lot incident, but it did not reject Plaintiff's policy limits demand when it received it. (*Id.* ¶ 20.) Instead, State Farm conducted further investigation to gather additional information about Plaintiff's claim. (*Id.*)[3]

---

**3.** Plaintiff claims that State Farm claims ad-

juster Chuck Nobis "stated that he was too

Adjuster Chuck Nobis noted on June 27, 2005 that State Farm did not have enough information to evaluate Plaintiff's claim, and Team Manager Ron Herman noted that questions of causation existed. (Add'l Facts ¶¶ 45–46.) Plaintiff offered to settle his claim for the $85,000 policy limits on August 15, 2005 and, after four days, State Farm asked to consider the offer further. (*Id.* ¶¶ 48–49.) On August 24, 2005, State Farm rejected Plaintiff's offer. (*Id.* ¶ 50.) A month later, adjuster Joi Marsh reviewed Plaintiff's file and recommended that State Farm settle the case. (*Id.* ¶ 51.) Later, adjuster Steve Thomas also recommended that State Farm settle Plaintiff's claim. (*Id.* ¶ 54.)

As part of this investigation on September 7, 2005, State Farm took Plaintiff's deposition. In deposition, Plaintiff admitted that his physician had not actually told him that he needed surgery as a result of the parking lot accident. (*Id.* ¶ 21.) Rather, the physician had said that Plaintiff might benefit from surgery at some point in the future. (*Id.*) Plaintiff also admitted that he had no intentions of having surgery. (*Id.*) Finally, Plaintiff admitted that he in fact did not miss any work projects as a result of the May 2003 incident. (*Id.*)

At State Farm's request, an independent board certified orthopedic surgeon examined Plaintiff and reviewed his medical records to evaluate his injuries. (*Id.* ¶ 22.) According to the orthopedic surgeon's report to State Farm, most of the injuries that Plaintiff claimed were caused by the 2003 accident, in fact, existed prior to the accident. (*Id.*) Further, to the extent that Plaintiff needed surgery, that need was the result of a degenerative disc condition that had been aggravated by the earlier 2002 freeway accident. (*Id.*) Finally, the surgeon determined that Plaintiff had most likely suffered some soft tissue trauma to his cervical spine when the other car rolled into Plaintiff's bumper. (*Id.*) Although it was possible that this soft tissue trauma could have aggravated Plaintiff's long-standing degenerative disease problems, the surgeon concluded that, even with such aggravation, Plaintiff should have only needed some ice, analgesics, and a maximum of about 10 to 14 physical therapy visits to bring him back to his pre-May 2003 accident condition. (*Id.*) These reports were dated October 21, 2005 and October 31, 2005.[4]

On December 1, 2005, State Farm offered Plaintiff $5,000, in addition to the $7,000 in medical expenses it already paid, to settle his claim. (*Id.* ¶ 25.) Plaintiff rejected State Farm's offer. (*Id.* ¶ 26.) The parties proceeded to arbitration on December 7–13, 2005. (Add'l Facts ¶ 61.) At arbitration, Plaintiff claimed over $500,000 in damages and requested the policy limit of $85,000 (which was $100,000 minus $15,000 paid by Cencal) and $17,005 in medical expenses (the $25,000 limit minus the $7,995 State Farm had already

---

busy to evaluate the claim and was going to evaluate 20 other cases before attending to Maynard's claim.'' (Add'l Facts ¶ 41.) In reality, the undisputed evidence demonstrates that Mr. Nobis advised Plaintiff that he would "try to get to eval as soon as possible but have about 20 cases ahead of his." (Declaration of Heather M. McKeon ("McKeon Decl.") Exh. 3 at 00032.) The undisputed evidence also demonstrates that Mr. Nobis reviewed Plaintiff's claim within three days. (*Id.*)

4. State Farm obtained a report dated December 1, 2005 from an independent board certified radiologist after he reviewed Plaintiff's MRI films. (*Id.* ¶ 23.) State Farm also obtained a report dated December 5, 2005 from a biomechanical engineer who evaluated the forces at issue in the May 2003 accident. (*Id.* ¶ 24.) The parties dispute when State Farm actually received these two reports, but, as discussed below, this dispute is immaterial for the current motion.

paid). (UF ¶ 27; Def.'s Filing of Evid., Exh. 29.) The arbitrator ultimately concluded:

> The Arbitrator finds that the amount of damages Claimant suffered as a result of the motor vehicle accident on May 23, 2003 was $86,000, which includes specials of medicals, loss of earnings and general damages. With an offset of the $15,000 which Claimant received from the underinsured and an offset of the $7,995 which Claimant received from MedPay benefits, the net award is $63,005.

(UF ¶ 28; Def.'s Filing of Evid. Exh. 30; Add'l Facts 62.) State Farm issued a check to Plaintiff and his attorney for the full amount of the arbitration award, $63,005. (UF ¶ 29.)

## II. LEGAL STANDARD

### A. Summary Judgment

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [that party's]

favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce any evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

## B. Bad Faith Insurance Claims

■ Plaintiff alleges that State Farm breached an implied covenant of good faith and fair dealing implied in his insurance contract when handling his claim in "bad faith." State Farm has moved for summary judgment, claiming that its handling of Plaintiff's claim was not unreasonable as a matter of law. As outlined above, the parties do not dispute any of the facts underlying Plaintiff's claim, but rather, whether a jury could infer from these facts that State Farm acted in bad faith, a question properly resolved on summary judgment. *See Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346, 108 Cal.Rptr.2d 776 (2001) ("While the reasonableness of an insured's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence."). Therefore, "as long as *there is no dispute as to the underlying facts,* it is for the court, not the jury, to decide whether the insurer had proper cause." *Id.* at 350, 108 Cal.Rptr.2d 776 (emphasis in original).

■ "Every contract imposes on each party an implied duty of good faith and fair dealing," which mandates that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Id.* at 345, 108 Cal. Rptr.2d 776 (citations omitted). In the context of insurance contracts, "the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay," but rather, to "act fairly and in good faith in discharging its contractual responsibilities." *Id.* at 346, 108 Cal.Rptr.2d 776 (citations omitted). This means that the insurer must not unreasonably withhold benefits due,

but "liability in tort arises only if the conduct was unreasonable, that is, without proper cause." *Rappaport–Scott v. Interinsurance Exch. of the Auto. Club,* 146 Cal.App.4th 831, 837, 53 Cal.Rptr.3d 245 (2007).

■ Mistakenly withholding policy benefits, if reasonable or legitimately disputed, does not give rise to liability. *See Chateau Chamberay,* 90 Cal.App.4th at 346, 108 Cal.Rptr.2d 776. Neither does delay while the insurer seeks information and investigates the insured's claim. *See Blake v. Aetna Life Ins. Co.,* 99 Cal.App.3d 901, 921, 160 Cal.Rptr. 528 (1979) (noting that insurer could "withhold payment until it could find out on its own, to a measure of certainty" that the insured was covered).

■ Most importantly for the purposes of this matter, an insurer does not act in bad faith so long as a "genuine dispute" exists over an insured's coverage. *See Rappaport–Scott,* 146 Cal.App.4th at 837, 53 Cal.Rptr.3d 245; *Chateau Chamberay,* 90 Cal.App.4th at 347, 108 Cal.Rptr.2d 776; *Fraley v. Allstate Ins. Co.,* 81 Cal.App.4th 1282, 1292, 97 Cal.Rptr.2d 386 (2000). A genuine dispute exists when an arbitrator awards substantially lower damages than Plaintiff claims. *See Rappaport–Scott,* 146 Cal.App.4th at 839, 53 Cal.Rptr.3d 245. An insurer may also demonstrate a genuine dispute if it relied on opinions from experts while evaluating the insured's claim. *See Fraley,* 81 Cal.App.4th at 1292, 97 Cal.Rptr.2d 386. However, in evaluating a genuine dispute, "it is essential that no hindsight test be applied. The reasonable or unreasonable action by the [insurer] must be measured as of the time it was confronted with the factual situation to which it was called upon to respond." *Paulson v. State Farm Mut. Auto. Ins. Co.,* 867 F.Supp. 911, 919 (C.D.Cal.1994) (citing *Austero v. National Cas. Co.,* 84

Cal.App.3d 1, 32, 148 Cal.Rptr. 653 (1978)).[5]

## III. ANALYSIS

■ State Farm argues that, based upon the undisputed facts, a genuine dispute existed between the parties as to Plaintiff's claim such that State Farm's actions were reasonable. State Farm asserts two rationales: (1) a genuine dispute existed because the arbitrator awarded Plaintiff damages substantially lower than those he claimed; and (2) the facts known to State Farm at the time it offered to settle with Plaintiff demonstrate that State Farm genuinely disputed Plaintiff's claim.

### A. Genuine Dispute Based Upon Discrepancy of Claim and Arbitration Award Under *Rappaport–Scott*

State Farm asserts that the court's decision in *Rappaport–Scott* controls this case and establishes, as a matter of law, that a genuine dispute existed between the parties. Plaintiff has made no effort to refute State Farm's position, and, despite Plaintiff's silence, the Court has independently reviewed the merits of State Farm's argument and finds it persuasive.

In *Rappaport–Scott*, the plaintiff-insured sued her insurer for bad faith for unreasonably rejecting her settlement offer for a claim caused by an underinsured motorist. 146 Cal.App.4th at 833, 53 Cal.Rptr.3d 245. Following the accident, the plaintiff settled the action with the underinsured motorist for $25,000, the applicable limit in the motorist's policy. *Id.* at 834, 53 Cal.Rptr.3d 245. She then submitted a claim to her

insurer. *Id.* She demanded arbitration of her claim, asserting losses of $346,732.34, including $26,732.34 in medical expenses, $20,000 in future medical expenses, $150,000 in lost income, and $150,000 in general damages. *Id.* She then requested an arbitration award of $75,000, which represented the $100,000 policy limit minus the $25,000 she had already recovered from the underinsured motorist. *Id.* She also made a settlement demand to the insurer for this amount, and the insurer counter-offered $7,000. *Id.* The arbitrator ultimately determined that the plaintiff suffered $15,000 in medical expenses, $3,000 for earnings losses, and $45,000 for pain, suffering and future medical care—a total of $63,000. *Id.* The arbitrator then reduced the plaintiff's award by the $25,000 the plaintiff received from the underinsured motorist and $5,000 for previously paid medical expenses, and awarded the plaintiff $33,000. *Id.*

The plaintiff brought suit in state court, alleging that the insurer acted in bad faith by offering her only $7,000, when the arbitrator later determined that $33,000 was payable, such that the insurer's actions were "intended to cause her to accept less than the amount she was entitled to receive." *Id.* at 838–39, 53 Cal.Rptr.3d 245. The court determined that a genuine dispute existed between the parties:

> The complaint alleges that in the arbitration, Rappaport–Scott claimed $346,732.34 in losses and sought policy benefits in the amount of $100,000 policy limit reduced only by the $25,000 that she had already received in settlement from the underinsured driver. Interinsurance offered to pay only $7,000 on

---

**5.** As State Farm points out, an arbitrator's ultimate conclusion on liability is irrelevant to a bad faith claim. *See, e.g., Paulson,* 867 F.Supp. at 919 ("The fact that State Farm changed its initial position and that the arbitrator subsequently found that State Farm

owed Paulson the limit of his policy does not imply that State Farm acted in bad faith in the first instance."); *Aronson v. State Farm Ins. Co.,* Case No. CV 99–4074, 2000 WL 667285, *10 (C.D.Cal.2000) (citing *Paulson* ).

the claim. The arbitrator determined that her total loss was $63,000 and reduced that amount by the $25,000 settlement and by ... $5,000, resulting in a total award of $33,000. Despite the difference between the $7,000 offered by Interinsurance and the $33,000 later determined to be payable on the policy, the vast difference between the $346,732.34 in losses claimed by Rappaport–Scott and the $63,000 in actual losses as determined by the arbitrator demonstrates, *as a matter of law,* that a genuine dispute existed as to the amount payable on the claim.

*Id.* at 839, 53 Cal.Rptr.3d 245 (emphasis in original).

The instant case is factually indistinguishable from *Rappaport–Scott.* Here, Plaintiff offered to settle his claim for the policy limit of $100,000, minus the $15,000 he received from Mitchum, the underinsured motorist. State Farm counter-offered for $5,000, which Plaintiff rejected. The parties then proceeded to arbitration, where Plaintiff claimed over $500,000 in damages, and sought the $85,000 policy limit with offset. The arbitrator found that Plaintiff's actual damages were $83,-000—far less than the $500,000 he claimed—and offset that amount by the $15,000 he already received from Mitchum, and the $7,995 he received from State Farm for medical expenses, ultimately awarding him $63,005 in damages.

As the court in *Rappaport–Scott* held, the discrepancy between what State Farm offered in settlement and what Plaintiff obtained as damages is not the relevant point; the measure of a genuine dispute is the difference between what Plaintiff claimed as damages and what Plaintiff was awarded during arbitration. Plaintiff's recovery in the arbitration was an astonishing $414,000 less than what he requested, the difference between $500,000 in claimed damages and $86,000 in damages as determined by the arbitrator. Indeed, even in *Rappaport–Scott,* the discrepancy between the plaintiff's estimate of damages and the arbitrator's award was only $283,000, one-third less than the discrepancy in this case. This discrepancy demonstrates that, as the *Rappaport–Scott* court held, State Farm had—"as a matter of law"—a genuine dispute with Plaintiff and therefore, State Farm acted reasonably in evaluating Plaintiff's claim.

### B. Genuine Dispute Based on the Facts Known to State Farm

Even if *Rappaport–Scott* were not so factually on point, the facts known to State Farm at the time it rejected Plaintiff's settlement offer demonstrate the parties had a genuine dispute over Plaintiff's claim. State Farm had the following information prior to offering Plaintiff $5,000 on December 1, 2005 to settle his claim:

- Plaintiff's vehicle sustained only $473 in damage;

- Neither the police nor an ambulance was called to the scene of the accident and fifteen minutes after the accident, Plaintiff drove himself home;

- Plaintiff's alleged injuries were similar to injuries Plaintiff sustained in a 2002 car accident, which exacerbated previous degenerative conditions;

- Plaintiff's medical treatment ceased in March 2004, only ten months following the accident;

- Cencal informed State Farm that it believed Plaintiff's claim was worth less that $15,000, which suggested that the UIM/UM coverage may not have been triggered;

- Plaintiff admitted during his deposition that he had not missed any work due to the accident, his doctor told him surgery might be an option at some

point, and Plaintiff had no intention of undergoing surgery; and

- An orthopedic surgeon reviewed Plaintiff's medical file and concluded that his injuries stemmed from the prior accident and pre-existing conditions, not the May 2003 accident.

This evidence is more than sufficient for State Farm to genuinely dispute Plaintiff's claim for $100,000 under the policy limits. The damage estimate was less than $500 and Plaintiff did not immediately report injuries, yet he claimed $100,000 under the policy limit, a fact that would raise a question with any rational insurer. State Farm learned that he had lingering injuries from a 2002 accident, which might explain the discrepancy between the minor character of the accident and Plaintiff's injury claims. Then Plaintiff ceased medical treatment after ten months, which, in itself raises a question as to the extent of his injuries. *See Montoya Lopez v. Allstate Ins. Co.*, 282 F.Supp.2d 1095, 1103 (D.Ariz.2003) ("The fact that the medical records suggest improvement early on is sufficient to establish that plaintiff's claim is fairly debatable."). Further, Mitchum's insurance company indicated that Plaintiff's injury would likely not hit the $15,000 policy limit, yet further evidence that Plaintiff's claims may not approach the $100,000 policy limit. Finally, Plaintiff,

Plaintiff's doctor, and State Farm's orthopedic surgeon all raised serious questions about the cause and extent of Plaintiff's injuries. Not only is State Farm entitled to rely on its orthopedic surgeon's report to dispute Plaintiff's claim, *Fraley*, 81 Cal. App.4th at 1292, 97 Cal.Rptr.2d 386, but State Farm is also entitled to rely on all the information at its disposal—including Plaintiff's own statements and the report from his doctor—in disputing Plaintiff's claims. This undisputed evidence demonstrates, as a matter of law, that a reasonable jury could only find that State Farm acted in good faith. Therefore, summary judgment is appropriate.[6]

None of Plaintiff's arguments opposing summary judgment undercuts the Court's conclusion. First, Plaintiff claims that summary judgment is inappropriate because State Farm did not "respond to [Plaintiff's] demand by pointing out the deficiencies in the demand's scope." (Opp. at 12:2–3.) Plaintiff, however, cites no legal authority to suggest that State Farm was required to respond, point by point, to Plaintiff's demand in order to create a genuine dispute. Plaintiff also claims that State Farm "ignored evidence" in the claim file, instead focusing "only on evidence supporting denial." (Opp. at 12:19–13:19.) While it certainly may be true that

---

**6.** Plaintiff's citation to *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979) does not compel a different result. There, the California Supreme Court held that "an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claims." *Id.* at 817, 169 Cal.Rptr. 691, 620 P.2d 141. There, however, the Court upheld the trial court's directed verdict in the plaintiff's favor because "as a matter of law [ ] defendants' failure to have plaintiff examined by a doctor of their choice or to consult with plaintiff's treating physicians and surgeon violated the covenant of good faith and fair dealing." *Id.* The instant case is

factually distinguishable because State Farm obtained both Plaintiff's doctor's examination and obtained its own report from an orthopedic surgeon before offering to settle Plaintiff's claim. That State Farm did not obtain *additional* reports from a radiologist and biomechanical engineer prior to offering a settlement does not automatically render State Farm's investigation less than thorough. If that were the case, then a plaintiff could defeat summary judgment simply by pointing to any number of additional expert reports that the insurer could have—but failed to—obtain that would have somehow better informed its evaluation of Plaintiff's claim. *Egan* does not stand for that proposition.

an insurer who focuses only on evidence to deny a claim might act in bad faith, the "evidence" cited by Plaintiff does not demonstrate that this is such a case. Plaintiff's cited facts are comprised of simply undisputed facts, spun in Plaintiff's favor. Noticeably absent is any reference to which facts were *ignored* by State Farm and the Court cannot locate any.

Moreover, Plaintiff raises various issues about State Farm's pre-June 2005 investigation of the May 2003 accident. For example: Plaintiff complains that in July 2003, State Farm noted his prior 2002 accident rather than opening a file for the May 2003 accident; State Farm contacted Mitchum's insurer rather than Plaintiff; State Farm noted in August 2003 that the UM/UIM policy appeared not to apply; State Farm delayed action because his medical bills were incorrectly routed; State Farm took a month to issue his medical payment in April 2004; State Farm delayed a year before obtaining photos of the vehicles in June 2004; and State Farm issued a Reservation of Rights letter in September 2004. These allegations are irrelevant because, prior to Plaintiff's June 2005 claim under his UM/UIM policy, State Farm had *no* obligation to investigate Plaintiff's accident. *See* Cal. Ins. Code § 11580.2(p)(3) ("[Underinsured motorist] coverage does not apply to any bodily injury until the limits of bodily injury liability policies applicable to all insured motor vehicles causing the injury have been exhausted by payment of judgments or settlements, and proof of payment is submitted to the insurer providing the underinsured motorist coverage."). Therefore, State Farm cannot be liable for any actions prior to Plaintiff's claim for benefits. *Cf. Waller v. Truck Ins. Exch., Inc.,*

11 Cal.4th 1, 35–36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) ("Absent that contractual right [to benefits], however, the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings.").

Plaintiff also points to various other evidence to suggest State Farm acted unreasonably in handling his claim, but "[s]loppy or negligent claims handling does not rise to the level of bad faith." *Chateau Chamberay,* 90 Cal.App.4th at 351, 108 Cal. Rptr.2d 776; *see also Guebara v. Allstate Ins. Co.,* 237 F.3d 987, 995 (9th Cir.2001) ("[U]nder California law, negligence is not bad faith."). For example, Plaintiff claims that one claims adjuster, Chuck Nobis, said he was "too busy" to work on Plaintiff's claim. The Court notes that Plaintiff has mischaracterized the adjuster's comment on his busy workload, since he merely stated that he would "try to get to eval as soon as possible but have about 20 cases ahead of [Plaintiff's]." (McKeon Decl., Exh. 3 at 00032.) Moreover, the evidence indicates that Mr. Nobis in fact took action on Plaintiff's claim within three days. (*Id.*) Plaintiff also believes that using multiple claims adjusters on his claim constituted bad faith. While using multiple adjusters may not be the best business practice, sloppy claims handling on State Farm's part does not constitute bad faith. *See Chateau Chamberay,* 90 Cal.App.4th at 351, 108 Cal.Rptr.2d 776.[7]

Finally, Plaintiff disputes when State Farm received and reviewed the December 1, 2005 report from the radiologist and the December 5, 2005 report from the biomechanical engineer, suggesting that

---

7. Plaintiff claims that these and State Farm's other actions in investigating and evaluating his claim violated regulations implementing Cal. Ins.Code § 790.03, which he claims is evidence of bad faith. However, because the Court finds that these activities do not constitute bad faith, the Court rejects this contention.

State Farm did not have these reports to consider when offering to settle Plaintiff's claim on December 1, 2005. However this dispute is not material to State Farm's summary judgment motion. Plaintiff does not dispute the other information State Farm claims to have had in its possession, including the information from Plaintiff and his doctor, and the report from State Farm's orthopedic surgeon. Therefore, even assuming State Farm had not seen the reports from the radiologist or the biomechanical engineer at the time it offered to settle Plaintiff's claim, it still had plenty of information on which to genuinely dispute Plaintiff's claim for the $100,000 policy limits.

As the court in *Chateau Chamberay* found, "[o]nly one inference can be drawn from this record. [The insurer] had a reasonable and legitimate basis for questioning [the insured's] claim, as the ultimate resolution of that claim by the arbitrator confirmed.... [The insurer] had every right to question these matters and to require [the insured] to provide full and proper support for its demands." *Id.* at 350, 108 Cal.Rptr.2d 776. State Farm's actions may not have been the best model of claims handling, but "[o]nly one inference can be drawn from this record": State Farm had a reasonable basis upon which to genuinely dispute Plaintiff's claim and it did not act in bad faith as a matter of law. *Id.*

## IV. CONCLUSION

For the reasons articulated herein, the Court GRANTS Defendants' Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**